IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DR. PETER A. MCCULLOUGH,        )
                                    )
     Plaintiff,                  )
                                    )
     v.                        )    Civil Action No. 1:22-cv-1099 (RDA/LRV)
                                    )
GANNETT, CO., INC., *et al*,        )
                                    )
     Defendants.             )
                                    )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Gannett Co., Inc. ("Gannett") and The Bartlesville Examiner-Enterprise's ("*BEE*") Motion to Dismiss (Dkt. 12) and Motion for Attorney's Fees (Dkt. 10). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motion together with Gannett and the *BEE*'s Memoranda in Support (Dkt. Nos. 11; 13), Plaintiff's Oppositions (Dkt. Nos. 17; 18), and Gannett and the *BEE*'s Replies in Support of their Motions (Dkt. Nos. 19; 20), this Court GRANTS Defendants' Motion to Dismiss (Dkt. 12) and DENIES Defendants' Motion for Attorney's Fees (Dkt. 10) for the reasons that follow.

## I. BACKGROUND[1]

### A. Factual Background

Plaintiff, Dr. Peter McCullough, is an "internist, cardiologist, and epidemiologist." Dkt. 1 ¶ 1. He holds various certifications and has published articles on a "range of topics." *Id.* He practices "internal medicine" including the "cardiovascular complications of both the viral infection and the injuries developing after the COVID-19 vaccine." *Id.*

Dr. McCullough has been a "leader in the medical response to COVID-19" since "the outset of the pandemic." *Id.* He published an early article about COVID-19, has been involved in peer-review of various publications related to COVID-19, and "commented extensively on the medical response to the COVID-19 crisis[,]" including through testimony before federal and state legislatures. *Id.* He is "considered one of the world's leading experts on COVID-19." *Id.*

Gannett, which is a Delaware corporation headquartered in McLean, Virginia, owns the *BEE*. *Id.* ¶¶ 5-6. The *BEE* is a "part of the USA Today network." *Id.* at ¶ 6. As a result, Gannett "control[s] the process to which [the *BEE*'s] articles [are] reported, edited and published, including the code of ethics and standard of care applicable to [the] *BEE*'s conduct." *Id.*

In October of 2021, Gannett and the *BEE* published an article about Dr. McCullough. The article, titled "Texas doctor critical of COVID-19 vaccines to speak at Bartlesville Community Center," was published on October 2, 2021. *Id.* ¶ 11; *see also* Dkt. 13-2, Ex. 1 (hereinafter "October 2 Article").[2] That article, *inter alia*, quoted various individuals (including Dr. Anuj

---

[1] For purposes of considering the Motions, the Court accepts all facts contained within Plaintiff's Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] Because the October 2, 2021 Article (and the subsequent article published on October 6, 2021, referred to *infra*) is a document that is "integral to the [C]omplaint" and specifically incorporated by Plaintiff, the Court can consider it in ruling on Defendant's Motion to Dismiss since there is no dispute as to its authenticity. *Tucker v. Sch. Bd. of the City of Va. Beach*, No.

Malik) who criticized Dr. McCullough, described Dr. McCullough's involvement in COVID-19 treatment and research, and discussed the state of COVID-19 in the Bartlesville area. *See generally* October 2 Article.

Dr. McCullough claims that the following statements in that article are defamatory:

- In discussing the views of individuals who wanted to hear Dr. McCullough's opinions on "vaccine safety and early treatment," Dr. Malik said that "[those] kinds of expressed views are dangerous to the public and pure quackery." *Id.* at 1.[3]

- The *BEE*'s quotation of Dr. Malik, who says: "The governments of the world cannot get along on anything, why should they get along on vaccines? … The World Health Organization, the CDC, the NIH, the European Centre for Disease Prevention and Control, everybody says the same thing about the vaccine.  It's safe, its effective and the people who are spreading this information about it for what reason nobody can understand other than these people are pathological.  These people are killing people." *Id.* at 2.

Gannett and the *BEE* published a second article on October 6, 2021.  Dkt. 1 ¶ 12.  That article, titled "Doctor fired for spreading COVID misinformation finds supportive crowd in Bartlesville[,]" covered Dr. McCullough's speech in Bartlesville. *Id.* ¶ 11; *see also* Dkt. 13-2, Ex. 2 (hereinafter "October 6 Article").

Dr. McCullough also claims that certain statements in the October 6 article are defamatory. He claims the following statements are defamatory:

- The title of the article, which states that Dr. McCullough was "fired for spreading COVID misinformation."  October 6 Article at 1.

---

2:13-cv-530, 2014 WL 5529723, at *8 n.4 (E.D. Va. Oct. 31, 2014) (quoting *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  The Court references it as incorporated into the Affidavit of Michael Grygiel (Dkt. 13-2).

[3] Because the Court considers the article itself as a document integral to the Complaint, the Court refers to the actual language in the article, rather than Plaintiff's Complaint, which alleges what is contained in the article. *See Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and [an exhibit] … the exhibit prevails." (cleaned up)).

- The article's description of Dr. McCullough, which describes him as a "Dallas cardiologist who is largely discredited by the scientific community for his assertions that the COVID-19 vaccines are unsafe and that early treatment options have been suppressed." *Id.*

- A statement from Dr. Malik, who described Dr. McCullough's appearance as a "politically motivated, ideological speech by a modern-day quack." *Id.* (quoting Dr. Malik).

- The article's assertion that "[t]hroughout the evening, McCullough made multiple claims that are largely uncorroborated by the scientific community." *Id.* at 2.

- A paragraph in the article that reads: "One of McCullough's biggest claims of the night was that 15,937 Americans have died after taking the vaccine, which Malik said is taken completely out of context." *Id.*

- A description of Dr. McCullough's speech that he "blatantly told the audience that there is not a vaccine safety board[,]" and providing Dr. Malik's view: "Malik points to the Data and Safety Monitoring Board (DSMB) that oversaw the vaccine trials." *Id.*

- The article recounting Dr. McCullough "shar[ing] what he said was a threatening letter from the American Board of Internal Medicine warning that he could lose his certification for spreading misinformation[,]" and then stating that "[t]here is likely a good reason for his concern about losing certification." *Id.* at 3.

- The article's publication of Dr. Malik's statement that Dr. McCullough's "claims fail to meet the standard of what is true. None of his suggestions have been submitted to a clinical trial despite the fact that we are 20 months into this pandemic[.]" *Id.* at 4 (quoting Dr. Malik).

Dr. McCullough claims that these statements in the two articles "held him up to scorn, shame, ridicule, and contempt, and rendered him infamous, odious, and ridiculous in the eyes of readers." Dkt. 1 ¶ 13. He cites various tweets that, *inter alia*, call him a "quack," a liar, and claim that he was fired for spreading misinformation. *See id.* at 6-7 (identifying critical tweets).

Dr. McCullough also claims that his "reputation and business" were injured by the allegedly defamatory statements in the two articles. He lost "numerous business opportunities, including speaking engagements[] and substantial consulting income." *Id.* ¶ 14. Specifically,

4

"[m]edia outlets cancelled appearances" and "potential businesses partners stepped back because of the reputational risk."  *Id.*  Finally, he claims that he "continuously suffers public shame, ridicule, emotional distress, anxiety, insecurity, fear for his safety and the safety of family members, fear that the defaming remarks have reached family, friends, colleagues and other members of the public beyond the medical community, fear that he has lost standing and credibility in the community, fear that he will never be able to clear his name, and injury to his reputation." *Id.*

## B. Procedural Background

Plaintiff filed his Complaint on September 26, 2022.  Dkt. 1.  After the parties agreed to an expansion of the page limits and an expanded time for the *BEE* and Gannett to respond to the Complaint, Dkt. Nos. 7; 9, the *BEE* and Gannett moved to dismiss the complaint and for attorney's fees on December 9, 2022.  Dkt. Nos. 10; 12.  Plaintiff opposed both motions on December 30, 2022.  Dkt. Nos. 17; 18.  The *BEE* and Gannett replied in support of the two motions on January 13, 2023.  Dkt. Nos. 19; 20.

On March 22, 2023, this Court ordered Plaintiff to show cause why the two other Defendants named in the Complaint—Dr. Anuj Malik and Ascension St. John Hospital—should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m).  Dkt. 28.  Plaintiff did not show cause, and this Court dismissed Dr. Malik and St. John Hospital from this case on April 12, 2023.  Dkt. 29.  As a result, only Gannett and the *BEE* remain as Defendants in this matter.

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(2) Motions

A Rule 12(b)(2) motion challenges the Court's personal jurisdiction over a party.  Fed. R. Civ. P. 12(b)(2).  Federal district courts are of limited jurisdiction, and as a result they can "only

exercise personal jurisdiction if such jurisdiction is authorized by the long-arm statute of the state in which it sits and the application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." *Consulting Eng. Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).

Virginia's "long-arm statute" allows courts to "extend[] personal jurisdiction to the extent permitted by the Due Process Clause," meaning that the statutory inquiry and constitutional inquiry are one and the same. *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002). To "satisfy the constitutional due process requirement, a defendant must have sufficient 'minimum contacts' with the forum state such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Geometric Ltd.*, 561 F.3d at 277 (quoting *Int'l Shoe Co. v. Wash.*, 362 U.S. 310, 316 (1945)).

A plaintiff can establish personal jurisdiction in accordance with the Due Process Clause in two ways. First, the plaintiff can allege that the Court has "general jurisdiction" over a defendant "whose activities in the forum state have been continuous and systematic." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997). Second, a plaintiff can allege "specific jurisdiction" which would be jurisdiction "based on conduct connected to the suit." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002).

A plaintiff bears the burden to demonstrate that personal jurisdiction exists. *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020). The plaintiff "need only make a prima facie showing" but must still establish personal jurisdiction "by a preponderance of the evidence." *Id.* In ruling on a motion to dismiss based on personal jurisdiction grounds, a court may rely on "the parties' motion papers, affidavits attached to the motion, supporting legal

memoranda, and the allegations in the complaint." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).

### B. Rule 12(b)(6) Motions

A Rule 12(b)(6) motion tests the sufficiency of a complaint. *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal of the motion is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff].'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in

evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing Goldfarb, 791 F.3d at 508).

## III. ANALYSIS

### A. The *BEE's* 12(b)(2) Motion

The *BEE* brings a 12(b)(2) Motion to Dismiss for lack of personal jurisdiction.  The *BEE* brings both a facial and factual challenge to Plaintiff's assertion of jurisdiction: it challenges both the sufficiency of Plaintiff's allegations and the factual bases supporting his claim that the *BEE* is subject to personal jurisdiction in this Court.

Plaintiff's attempt to establish jurisdiction over the *BEE* is thin.  His only relevant allegation is that the *BEE* is "at home in Virginia and [is] subject to general personal jurisdiction in Virginia."  Dkt. 1 ¶ 9.  There are no other allegations in his Complaint supporting jurisdiction over the *BEE*.  Indeed, Plaintiff's counsel acknowledged that this Court cannot exercise jurisdiction over the *BEE* and agreed to "drop the *BEE* as a party Defendant."  Dkt. 17 at 9 n.4. Accordingly, because Plaintiff does not oppose Defendant's Motion to Dismiss the *BEE* for lack of personal jurisdiction, that Motion will be GRANTED.

### B. Defendant Gannett's 12(b)(6) Motion

Defendant Gannett brings a 12(b)(6) motion.  It first argues that it is the "wrong Defendant" in this action because Plaintiff cannot "implicate Gannett for its affiliate's publications" by simply "point[ing] to the parties' corporate relationship."  Dkt. 13 at 9.  Next, and in the alternative, Gannett argues that Plaintiff's defamation claim is substantively faulty for four separate reasons: (1) certain "defamatory" statements that Plaintiff has identified are true statements and thus cannot be a basis for defamation liability, *id.* at 14-16; (2) most of the challenged statements are "constitutionally protected opinions," *id.* at 16-26; (3) Plaintiff has not plausibly alleged actual

malice against Gannett, *id.* at 26-39; and (4) Gannett is immunized under Virginia's Anti-SLAPP statute, *id.* at 39-40.

### 1. Gannett's Liability

Gannett's first argument is that it cannot be held liable for articles that another entity (the *BEE*) published.  According to Gannett, Plaintiff "takes aim at Gannett" in an effort to secure "a forum in Virginia."  *Id.* at 9.  Gannett claims that the *BEE* is the entity responsible for publishing the articles containing the defamatory statements Plaintiff has identified, meaning that Plaintiff's Complaint has to plausibly plead facts that pierce the corporate veil to hold Gannett, the *BEE*'s parent company, liable.  Gannett asserts that Plaintiff has failed to do so, and that his Complaint must be dismissed as to Gannett as a result.

In support of its argument, Gannett improperly casts aside Plaintiff's allegation that Gannett itself published the articles at issue.  Dkt. 13 at 9.  In Plaintiff's Complaint, he affirmatively alleges that both Gannett and the *BEE* published the defamatory articles.  *See, e.g.*, Dkt. 1 ¶ 11 ("On October 2, 2021, *Gannett and BEE* published an article . . . ." (emphasis added)); *id.* ¶ 12 ("On October 6, 2021, *Gannett and BEE* published a second article . . . ." (emphasis added)).  Gannett quickly dispatches with that allegation by citing an Affidavit from Kim Archer, a *BEE* editor, who swore that the *BEE* published the articles without involvement from Gannett.  Dkt. 13 at 9 (citing Archer Decl., Dkt. 13-1, ¶¶ 3-6, 10).  At this stage, the Court cannot consider the Archer Affidavit for non-jurisdictional purposes, as it contradicts the allegations in Plaintiff's Complaint.  The fact that Gannett itself published the articles at issue is a factual, non-jurisdictional allegation that the Court must accept as true.  *Faustin*, 402 F. Supp. 3d at 315.

While Plaintiff's allegation that Gannett published the articles at issue walks the line between conclusory and factual, the Court construes the allegation as a factual one it must accept

as true.  In numerous other cases, the alleged (or undisputed) facts have shown that Gannett is a publisher, which indicates that Plaintiff's allegation that Gannett is a publisher in this case is plausible.  *See, e.g.*, *The News and Observer Pub. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 573 (4th Cir. 2010) (describing Gannett Co., Inc. as a publisher); *McManama v. Gannett Co., Inc.*, No. 2:7-cv-479, 2008 WL 4951357, at *2 (M.D. Ala. Nov. 18, 2008) (same); *Miami Gold Prods, Inc.*, *v. Gannett Co., Inc.*, 593 F. Supp. 672, 672 (S.D.N.Y. 1984) (same).  And multiple entities can be publishers of a single article; viewing the allegations in a light most favorable to Plaintiff, that is what he pleads.  *See Eramo v. Rolling Stone LLC*, 314 F.R.D. 205, 207 (W.D. Va. 2016) (identifying two entities as publishers of an article).  This Court cannot evaluate the veracity of Plaintiff's allegations at this stage; instead, it must credit Plaintiff's allegation that Gannett itself published the articles and disregard Gannett's factual assertions otherwise.

The posture of this case and Plaintiff's specific allegations renders each of Gannett's cited cases inapposite.  For example, Gannett cites *Stern v. News Corp.*, No. 8 Civ. 7624, 2010 WL 5158635 (S.D.N.Y. Oct. 14, 2010) in arguing that Plaintiff's allegation that "Gannett controlled the process of publication fails [as] a matter of law."  Dkt. 13 at 11.  But *Stern* was resolved at summary judgment, meaning that there was discovery into who actually published the statements at issue.  *Stern*, 2010 WL 5158635, at *1.  And the facts in *Stern* showed that the named defendant was not the publisher and could not be held liable through veil-piercing.  *Id.* at *4.  Likewise, Gannett's other cited cases are not on point.  *See Williby v. Hearst Corp.*, No. 5:15-cv-2538, 2017 WL 2929454, at *2 (N.D. Cal. July 10, 2017) (plaintiff could not maintain suit against employer of alleged defamer); *Susko v. Cox Enterprises, Inc.*, No. 5:7-cv-144, 2008 WL 4279673, at *8 (N.D. W. Va. Sep. 16, 2008) (plaintiff sought to hold company liable simply because it was parent corporation, not because it was a publisher); *Bernstein v. O'Reilly*, No. 17 Civ. 9483, 2019 WL

10995111, at *6 (S.D.N.Y. Mar. 5, 2019) (no allegation that alleged defamatory statements were "streamed" or even "linked" by defendants); *Payoda, Inc. v. Photon Infotech, Inc.*, No. 14-cv-4103, 2015 WL 1325562, at *3 (N.D. Cal. Mar. 24, 2015) (no allegation that named defendant was publisher).

Plaintiff has adequately alleged that Gannett itself published the articles containing the statements he alleges are defamatory. Accordingly, taking Plaintiff's allegations as true, Gannett can theoretically be held liable for the defamatory statements and is a proper defendant in this matter.

### 2. Plaintiff's Defamation Claim

Gannett next argues that Plaintiff cannot make out a substantive defamation claim against it. In Virginia, the elements of a defamation claim are: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018) (citing *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015)). As explained *supra*, Plaintiff has sufficiently alleged that Gannett published the articles at issue.

### a. Actionable Statement

In analyzing defamation claims, courts examine only the particular statements that the plaintiff has identified as defamatory. A complaint must "identify which specific statements plaintiff considers defamatory or libelous." *Compel v. Citi Mortg., Inc.*, No. 1:4-cv-1377, 2005 WL 4904816, at *1 (E.D. Va. Feb. 23, 2005); *see Lokhova v. Halper*, 441 F. Supp. 3d 238, 259 (E.D. Va. 2020) (plaintiff's claim was deficient under Rule 8 when she failed to provide "sufficient information about [defendant's] defamatory statements"). Accordingly, this Court examines only whether each statement that Dr. McCullough has identified as defamatory—as set forth *supra*—is actionable.

To be actionable, statements must be "both false and defamatory."  *Couric*, 910 F.3d at 783.[4]  "Defamatory words are those tending to harm the reputation of another as to lower him to the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (cleaned up).  This can include language that "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous."  *Id.*

Here, Gannett does not appear to contest Plaintiff's argument that the statements he has identified are defamatory.  Instead, Gannett argues that the statements are not false, because they are (1) opinions; (2) scientific facts that are not demonstrably false; and/or (3) literally true.

Because statements must be false to be actionable, it follows that statements that are not factual assertions cannot be the basis for defamation liability.  The typical example of this is an opinion.  Simply put: "[s]tatements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false." *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 509 (E.D. Va. 2016) (quoting *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 40 (2006)).

Courts have been somewhat imprecise when describing the actionability of opinions.  To be clear, "there is no categorical constitutional defense for statements of opinion."  *Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009) *aff'd* 562 U.S. 443 (2011).  Rather, the First Amendment protects "statements that cannot reasonably be interpreted as stating actual facts about an individual" to ensure that "public debate will not suffer for lack of imaginative expression or the

---

[4] In *Couric*, the Fourth Circuit applied Virginia law as set forth in *Schaecher*, 290 Va. 83, and so *Couric* is directly on point here.

rhetorical hyperbole which has traditionally added much to the discourse of this Nation." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (cleaned up).  Because there is no categorical protection for opinions, courts are to instead "assess how an objective, reasonable reader would understand" a statement, "emphasiz[ing] the verifiability of the statement," since "a statement not subject to objective verification is not likely to assert actual facts."  *Phelps*, 580 F.3d at 219.

There are two main categories of speech that "cannot be reasonably interpreted as stating actual facts about an individual," and are thus constitutionally protected.  *Id.*  First, the First Amendment protects statements "relating to matters of public concern which [do] not contain a provably false factual connotation."  *Milkovich*, 497 U.S. at 20.  Second, "rhetorical speech" that uses "loose, figurative, or hyperbolic language" is entitled to First Amendment protection and therefore is not actionable.  *Phelps*, 580 F.3d at 220.

The implication, then, is that there are statements that may be colloquially referred to as "opinions" but are nevertheless actionable under defamation law.  For example, if there is a "provably false connotation" in an opinion, it is "thus capable of being true or false" and the opinion may be actionable.  *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 660 (E.D. Va. 2015) (cleaned up).  Similarly, if an opinion is "laden with factual content and the underlying facts are allegedly false[,]" it may be actionable.  *Andrews v. Va. Union Univ.*, No. 3:7-cv-447, 2007 WL 4143080, at *8 (E.D. Va. Nov. 19, 2007).  The line between actionable and non-actionable opinion is one this Court must draw after considering each "statement as a whole" and in context.  *Anderson v. Sch. Bd. of Gloucester Cnty., Va.*, No. 3:18-cv-745, 2020 WL 2832475, at *37 (E.D. Va. May 29, 2020).

The speech that is at issue here further blurs the line between actionable and non-actionable statements.  Both Dr. McCullough and his critics were speaking about topics—the COVID-19

illness, vaccine, and pandemic—that at the time (and to this day) remain the subject of vigorous scientific debate.  It is not this Court's job to pick sides in a scientific debate.  *See Arthur v. Offitt*, No. 1:9-cv-1398, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010) ("Courts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context.").  Rather, this Court's function is to protect each citizen's First Amendment rights, so as to "preserve an uninhibited marketplace of ideas in which truth"—whatever that truth may be —"will ultimately prevail . . . ."  *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969).  With that in mind, the Court evaluates Plaintiff's claim that certain statements in the published articles are actionable.

Neither of the statements from the October 2 Article that Plaintiff has identified are actionable.  Dr. McCullough claims the following statements are actionable[5]:

> Local resident Jonathan Bolding told the E-E that he and others with concerns about the vaccine invited Dr. Peter McCullough to Bartlesville. The 6:30 p.m. event will be set up for 500 people. His topics are vaccine safety and early treatment.
>
> "Medicine is not only science, it's an art," Bolding said. "There has to be some point where you venture out and try something."
>
> However, Dr. Anuj Malik, an infection disease physician at Ascension St. John, told the E-E that these kinds of expressed views **are dangerous to the public and pure quackery.** [6]
>
> . . .
>
> "The governments of the world cannot get along on anything, why should they get along on vaccines?" Malik said. "The World Health Organization, the CDC, the

_____

[5] The portions that Dr. McCullough claims are defamatory are bolded, but the full context of the allegedly defamatory statements is provided.

[6] A reader could interpret this statement as not directed at Dr. McCullough, but instead at the views of the citizen referred to in the preceding paragraphs.  However, reading the allegations in a light most favorable to Plaintiff, the Court recognizes that a reader could also ascribe the views that Dr. Malik is criticizing to Dr. McCullough, and so the Court analyzes whether the statement is defamatory.

> NIH, the European Centre for Disease Prevention and Control, everybody says the same thing about the vaccine. It's safe, it's effective and the people who are spreading this information about it for what reason nobody can understand other than **these people are pathological. These people are killing people.**"

October 6 Article at 1-2.  Both statements "cannot be reasonably interpreted as stating actual facts about an individual," and, as a result, are not actionable.  *Milkovich*, 497 U.S. at 20.  First, it is undeniable that the COVID-19 pandemic is a matter of public concern, and the first statement does not contain a "provably false factual connotation[;]" it would be impossible to prove the falsity of Dr. Malik's statement that Dr. McCullough's views are "dangerous to the public and pure quackery."  Second, both statements contain the sort of "rhetorical hyperbole" that the First Amendment protects.  *Choi v. Kyu Chul Lee*, 312 F. App'x 551, 553 (4th Cir. 2009).  The first statement calls Dr. McCullough's views "dangerous and pure quackery," which—read in context—is hyperbolic language expressing Dr. Malik's opinions on Dr. McCullough and is not provably false.  *See Gonzalez v. Gray*, 69 F. Supp. 2d 561, 566-67 (S.D.N.Y. 1999) (statement that doctor was a "quack" was non-actionable opinion).  The second statement by Dr. Malik calls Plaintiff "pathological" and can be interpreted to be stating that people like Dr. McCullough "are killing people."  Read in context, that statement is not literally asserting that Dr. McCullough is killing individuals; rather, an objective reader would understand that Dr. Malik's statement used hyperbole to criticize Dr. McCullough's views on vaccines.  That sort of statement is the "quintessential example[] of non-actionable rhetorical hyperbole."  *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 301 (4th Cir. 2008) (holding that a defendant's statements that company was sending "killers" to Iraq was not offered as fact).

One of the statements in the October 6 article is not actionable for the same reasons.  Dr. McCullough alleges that the October 6 article contains the following defamatory statement:

> While McCullough said that doctors were probably afraid to show up to the event, one of Oklahoma's top infectious disease physicians, Dr. Anuj Malik, director of

infection prevention and control at Ascension St. John, said that the doctors he spoke to were not afraid to attend. They were just not interested in sitting through what would be seen as a "politically motivated, ideological speech by a **modern-day quack.**"

Like the statement printed in the October 2 Article, this statement by Dr. Malik expressing his views on Dr. McCullough is both a statement on a matter of public concern that is not provably false and a statement of "rhetorical hyperbole" that is protected by the First Amendment.

Two other statements from the October 6 Article that Dr. McCullough has identified are also non-actionable because they do not state facts.   The October 6 Article reads:

> Throughout the evening, McCullough **made multiple claims that are largely uncorroborated by the scientific community**. Among them is that a person who has already had COVID-19 does not need the vaccine and that it can be harmful to those who already have natural immunity.
>
> . . .
>
> McCullough shared what he said was a threatening letter from the American Board of Internal Medicine warning that he could lose his certification for spreading misinformation.
>
> **There is likely a good reason for his concern about losing certification.** A Dallas County court granted a temporary restraining order against him in July on behalf of Baylor Scott & White Health for continuing to claim titles, including vice chief of internal medicine at Baylor University Medical Center, even after he was fired from Baylor in February.

October 6 Article at 2-3.  Dr. McCullough asserts that the statements that he "made multiple claims that are largely uncorroborated by the scientific community" and that "[t]here is likely good reason for his concern about losing certification" are defamatory.  Dkt. 1 ¶ 12.  But those statements are not factual assertions; they are couched in language that, when taken in context, indicate they are non-actionable.

The first statement says that Dr. McCullough "made multiple claims that are *largely* uncorroborated by the scientific community."  October 6 Article at 2 (emphasis added).  The use

of the equivocating word "largely" indicates that the statement does not contain a factual assertion that Dr. McCullough's claims are wholly unsupported. Instead, the statement serves as an opinion about the veracity of Dr. McCullough' claims. *See Pace v. Baker-White*, 432 F. Supp. 3d 495, 512 (E.D. Pa. 2020) ("Cases in which challenged statements feature equivocal or cautionary language are routinely dismissed because the statements are non-actionable opinion."). Additionally, the statement is followed up by the facts supporting the article's assertion that his claims are "largely uncorroborated[,]" as the article goes on to discuss an example of how McCullough's claims are at odds with CDC guidance. October 6 Article at 2. Since the article "disclosed the factual basis for its view" and Dr. McCullough "does not challenge the accuracy" of those factual assertions, his challenge to that statement is "doom[ed.]" *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998).

For the same reasons, the statement that there "is *likely* a good reason for [Dr. McCullough's] concern about losing certification" is non-actionable.[7] October 6 Article at 3. Immediately following that statement, the October 6 Article discloses the facts upon which it is based—a TRO issued against Dr. McCullough for continuing to claim employment titles after he was fired. Once again, in addition to the equivocating language, the article provides the facts supporting the view that is expressed in the article. Dr. McCullough's failure to challenge the truth of those underlying facts is fatal to his claim. *Biospherics*, 151 F.3d at 185.[8]

---

[7] Plaintiff's own Complaint characterizes this statement as an opinion. *See* Dkt. 1 ¶ 12 (alleging that Gannett "falsely *opined* that there was 'likely a good reason' to believe that Dr. Mccullough risked losing his 'certification' from the American Board of Internal Medicine" (emphasis added)).

[8] Plaintiff is correct in arguing that this Court must "accept as false any statements which [he] alleges to be false." Dkt. 17 at 12 (quoting *Goulmamine*, 138 F. Supp. 3d at 659). But Plaintiff has not alleged that the underlying factual assertions about the TRO that was issued against him are false, meaning *Biospherics* applies with force here. 151 F.3d at 185.

Another statement that Plaintiff challenges is not actionable because it is an opinion based on disclosed facts.  The October 6 article quotes Dr. Malik:

> (McCullough's) claims **fail to meet the standard of what is true.** None of his suggestions have been submitted to a clinical trial despite the fact that we are 20 months into this pandemic . . . .

October 6 Article at 4.  According to Dr. McCullough, Dr. Malik's statement that his claims "fail to meet the standard of what is true" is false.  Dkt. 1 ¶ 12.  However, when read in context, it is evident that Dr. Malik is expressing his opinion about the rigor of Dr. McCullough's suggestions about certain COVID-19 treatments.  The article first quotes Dr. Malik as opining that clinical trials for drug recommendations are "considered the standard in establishing the truth."  October 6 Article at 4.  Then, in the statement that Dr. McCullough alleges is actionable, Dr. Malik asserts that Dr. McCullough fails to meet that standard because his suggestions about COVID-19 treatments had not been "submitted to a clinical trial[.]"  *Id.*  Put differently, Dr. Malik posits that Dr. McCullough's claims about the propriety of certain COVID-19 treatments failed "to meet the standard of what is true" because that standard is guided by the use of clinical trials, and Dr. McCullough has not submitted his suggestions to such a trial.  Dr. McCullough only challenges the veracity of Dr. Malik's view, not the underlying facts supporting that view, and so he cannot maintain a claim based on the assertion he challenges.  *See Biospherics, Inc.*, 151 F.3d at 185 ("When 'the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.'" (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993)).

Two other statements are not actionable due to Plaintiff's mischaracterization of them in his Complaint.  The article states:

> One of McCullough's biggest claims of the night was that **15,937 Americans have died after taking the vaccine**, which Malik said is taken completely out of context.

. . .

> McCullough also **blatantly told the audience that there is not a vaccine safety board.** Yet Malik points to the Data and Safety Monitoring Board (DSMB) that oversaw the vaccine trials. The board included 11 experts from four countries who are not employed by government or pharma companies.

October 6 Article at 2-3.  Dr. McCullough alleges that the October 6 Article reported that "Dr. McCullough *misstated* that 15,937 Americans have died after taking the vaccine" and that "Dr. McCullough blatantly *misstated* that there is not a vaccine safety board[,]" and challenges those statements as false.  Dkt. 1 ¶ 12 (emphasis added).  But the article does not say what Dr. McCullough claims it says.  Specifically, it does not claim that his pronouncements were false; rather, the article merely recounts that he made certain declarations about specific issues and subsequently provides Dr. Malik's opinion on those same issues.  Consequently, Dr. Malik's statements do not state facts about Dr. McCullough, but about the issues that Dr. McCullough was opining on.  Accordingly, those portions of the article are not statements that can "be reasonably be interpreted as stating actual facts about an individual" and are therefore not actionable. *Milkovich*, 497 U.S. at 20.

Those two statements are also not actionable for two additional, independent reasons.  First, the statements themselves are not defamatory: they merely recount what Dr. McCullough said and then provide a competing view.  A recitation of what someone said and the subsequent publication of a competing viewpoint does not "tend to injure one's reputation in the common estimation of mankind." *Couric*, 910 F.3d 780.  Second, Dr. McCullough does not challenge the truth of what the October 6 Article says: that he made certain statements during his speech.  Instead, Dr. McCullough challenges the truth of his own *incorrect* characterization of what the Article says— that Dr. McCullough was wrong when he made those two statements.  But his characterization is

19

not an accurate reading of the article.  Because Dr. McCullough has not challenged the truth of the actual statements that were published, they are not actionable.  *See Couric*, 910 F.3d at 783 (statements must be false to be defamatory).

That leaves three statements from the October 6 Article that Dr. McCullough has alleged are defamatory: (1) the title of the article, which states that Dr. McCullough was "fired for spreading COVID misinformation[;]" (2) the article's recounting of a report from Medscape that several colleges "cut ties with McCullough for spreading misinformation[;]"[9] and (3) the article's statement that Dr. McCullough is "a Dallas cardiologist who is largely discredited by the scientific community for his assertions that the COVID-19 vaccines are unsafe and that early treatment options have been suppressed[.]"  October 6 Article.

In arguing that Dr. McCullough cannot maintain a defamation claim based on the article's statements about his termination, Gannett only relies on the fact that the statements are substantially true.  In support, it offers a statement from Dr. McCullough in another case.  *See* Dkt. 13 at 14-15 (citing Dr. McCullough's statement).  But substantial truth is an affirmative defense, and the Court can only rule on such a defense at this posture "if all facts necessary" to the defense "clearly appear *on the face of the complaint*."  *Goodman v. Praxair*, 494 F.3d 458, 464 (4th Cir. 2007) (cleaned up) (emphasis in original); *see Edwards v. Schwartz*, 378 F. Supp. 3d 468, 522-23 (W.D. Va. 2019) (observing that "affirmative defenses such as substantial truth are . . . generally adjudicated at the summary judgment stage" absent "rare circumstances where facts sufficient to rule on [the defense] are alleged in the complaint").  Gannett does not argue that those necessary facts are present in the Complaint; instead, it relies on matter outside the Complaint to establish its

---

[9] Although Plaintiff does not specifically allege that this statement is defamatory, the nature of this statement is the same as the Article's title, which Plaintiff does claim is defamatory.  As a result, the Court finds it appropriate to analyze this statement, as well.

affirmative defense. But the Court cannot consider such evidence at this stage. Because nothing in the Complaint indicates otherwise, the Court must presume falsity. *Goulmamine*, 138 F. Supp. 3d at 659. Accordingly, the statements about Dr. McCullough's termination have been adequately alleged as both false and defamatory and are actionable.[10]

While it is a close call as to whether the Article's statement that Dr. McCullough is "largely discredited by the scientific community" is actionable, the Court concludes that it is. On the one hand, the statement contains equivocating language like other statements that the Court has found are not actionable. *Infra* at 16-17. But other factors distinguish this statement from the others. While it does contain equivocating language, the statement does not disclose any supporting facts. Moreover, when read in context, a reasonable reader could interpret the statement to mean that members of the scientific community have found Dr. McCullough's views that "vaccines are unsafe and that early treatment options have been suppressed" are unfounded. October 6 Article at 1. Because the statement contains a factual implication that members of the scientific community have found Dr. McCullough's claims to be baseless, the Court must presume that fact is false, and the statement is actionable. *See Biospherics,* 151 F.3d at 184 (holding that *Milkovich* provided that statements are actionable if they "can be reasonably interpreted to declare or imply untrue facts"); *see also Green v. Cosby*, 138 F. Supp. 3d 114, 132-333 (D. Mass. 2015) (holding that an assertion that an accusation was "discredited," with no "hyperbole or figurative language" surrounding it, had a literal obvious meaning that was actionable).

---

[10] Even though the statement that several colleges "cut ties with McCullough for spreading misinformation" only recounts a statement from an article in "Medscape," Gannett can still be held liable for publication of that statement. October 6 Article at 3. "Under the republication rule, one who repeats a defamatory statement is as liable as the original defamer." *Lee v. Dong-A Ilbo*, 849 F.2d 876, 878 (4th Cir. 1988). There are limited exceptions, such as the "official or fair report privilege[,]" but Gannett has not invoked those privileges at this stage. *Id.*

In sum, reading the Complaint in the light most favorable to Plaintiff, the October 2 Article does not contain any actionable statements, while the October 6 Article contains three actionable statements: (1) the title of the article, which states that Dr. McCullough was "fired for spreading COVID misinformation[;]" (2) the article's recounting of a report from Medscape that several colleges "cut ties with McCullough for spreading misinformation[;]" and (3) the article's statement that Dr. McCullough is "a Dallas cardiologist who is largely discredited by the scientific community for his assertions that the COVID-19 vaccines are unsafe and that early treatment options have been suppressed[.]" October 6 Article.

### b. Actual Malice

The Court now turns to the question of whether Plaintiff has adequately pleaded that Gannett published the allegedly defamatory statements "with the requisite intent." *Couric*, 910 F.3d at 783.

The intent that a plaintiff in a defamation case must plead depends on the plaintiff's status. In Virginia, a "private" plaintiff must plead that a defendant "published the [defamatory] statement knowing that it was false, or, believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Sepmoree v. Bio-Med. Applications of Va., Inc.*, No. 2:14-cv-141, 2014 WL 4444435, at *7 (E.D. Va. Sep. 8, 2014) (cleaned up) (quoting *Gazette, Inc. v. Harris*, 229 Va. 1, 15 (1985)).  On the other hand, a plaintiff who is a "public" figure must adequately allege facts that meet the strictures of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), which requires pleading facts that the defendant made the statement with "actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  376 U.S. at 280 (cleaned up).

A plaintiff can be considered a public figure in one of two ways.  Some individuals are "all-purpose public figures[,]" meaning that they have "achieve[d] such pervasive fame or notoriety that they become public figures for all purposes and for all contexts." *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1551-52 (4th Cir. 1994) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)) (cleaned up).  Others are "limited-purpose public figures, who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues." *Id.* at 1552 (cleaned up).  Gannett maintains that Plaintiff is a limited-purpose public figure.

Plaintiff does not contest that he is a limited-purpose public figure, Dkt. 17 at 21 n.9, and the allegations confirm as much.[11]  To determine whether a plaintiff is a limited-purpose public figure, the Court examines whether

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation.

*Hatfill v. N.Y. Times Co.*, 532 F.3d 312, 319 (4th Cir. 2008) (quoting *Foretich*, 37 F.3d at 1553). Here, each of those factors indicate that Plaintiff is a limited-purpose public figure.  He certainly had "access to channels of effective communication[,]" as the underlying lawsuit relates to a public speech that Plaintiff gave.  Moreover, in his Complaint, Plaintiff pointed to various speaking engagements he has had, including some before the United States Senate and state governments. Dkt. 1 ¶ 1.  Dr. McCullough also acknowledges that he "voluntarily assumed a role of special prominence" in the COVID-19 pandemic: he alleges that he "commented extensively on the

---

[11] Plaintiff does challenge the "continued viability of *New York Times v. Sullivan*[,]" arguing that the proper standard is one of negligence, but concedes that it applies here and only wishes to preserve that issue for appeal.  Dkt. 12 at 21 n.9.

medical response to the COVID-19 crisis" and that he "is considered one of the world's leading experts on COVID-19." *Id.* Those facts also indicate that he "sought to influence the resolution or outcome of" medical approaches to COVID-19 pandemic, as the Complaint alleges that Dr. McCullough injected himself into the debate about the COVID-19 vaccine and treatments. Finally, the fourth and fifth factors are clearly met here: controversy about COVID-19 treatments and vaccines began well before October of 2021 and was persisting at the time the articles were published. *See id.* (describing Dr. McCullough's work throughout 2020 and into 2021 and 2022).

Because Plaintiff is a limited-purpose public figure, he must plead facts indicative of actual malice on Gannett's part. There are various allegations that could support actual malice. For instance, Plaintiff could allege facts showing that Gannet published "a narrative and story line unmoored in the facts." *Fairfax v. CBS Broadcasting Inc.*, 534 F. Supp. 3d 581, 592 (E.D. Va. 2020) Or, Plaintiff could point to "circumstantial evidence that, taken together, evidences that [Gannett] acted with knowledge of the statement's falsity or that it 'entertained serious doubts as to the truth of its publication.'" *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968)) (cleaned up). What is critical, though, is that Plaintiff must plead facts; at the motion-to-dismiss stage, "conclusory allegation[s]" and "mere recitation[s]" of the actual malice standard are insufficient. *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012).

Dr. McCullough argues that he has pleaded actual malice. First, he claims that the statements are "so highly improbable that only a reckless person would put them in circulation." Dkt. 17 at 23; *see also* Dkt. 1 ¶ 20a. Second, he argues that "Gannett knew from peer-review [sic] studies and published research in its possession that Dr. McCullough's statements about COVID and the 'vaccines' were 100% factual and correct, and that the accusations of 'misinformation[,]'

'fraud' and lying were false." Dkt. 17 at 23; *see also* Dkt. 1 ¶ 20b.  Next, he contends that he has alleged facts that Gannett was motivated by "bias and prejudice." Dkt. 17 at 24; *see* also Dkt. 1 at 20c.  Finally, he maintains that his Complaint has alleged facts showing that "Gannett intentionally abandoned all journalistic standards and integrity, including its own code of ethics, in publishing and republishing the false statements." Dkt. 17 at 24; *see also* Dkt. 1  at 20d.

As a threshold issue, it is somewhat unclear what arguments about actual malice Plaintiff ascribes to each statement he claims is actionable.  For example, he claims that the "accusations that [Plaintiff] is a 'quack' and that he spread COVID misinformation are so highly improbable that only a reckless person would put them in circulation." Dkt. 1 ¶ 20a.  Plaintiff is certainly arguing that the statements referring to Dr. McCullough as a "quack" are "inherently improbable," but it is unclear which other statements he is making that argument for.  The same is true for Plaintiff's other arguments about actual malice.  For completeness, the Court addresses whether each fact that Plaintiff claims is indicative of actual malice adequately pleads actual malice for each statement that the Court has held are actionable.

In referring to "inherent improbability," Plaintiff seemingly argues that the very nature of the published statements indicates actual malice.  Significantly, there is no "inherent improbability" exception that replaces the requirement that Plaintiff plead facts showing actual malice.[12]  As Plaintiff's own cited cases show, a defamation plaintiff can only rely on inherent improbability to plead actual malice in a narrow set of circumstances where the allegations spin a factual story that is so implausible that "only a reckless man would believe it."  *See US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021) (finding that statements that there was a "vast

---

[12] In *St. Amant*, the Supreme Court referred to inherent improbability in discussing the sorts of situations where a good-faith argument about state of mind in a defamation case would be unlikely to prevail.  390 U.S. at 732.  It did not create an exception to the actual malice standard.

international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog" was inherently improbable). To determine whether that is the case, courts look to the other pertinent facts. *See id.* (recounting other allegations that made the claim "obviously improbable"); *Stern v. Cosby*, 645 F. Supp. 2d 258, 279 (S.D.N.Y. 2009) (reciting relevant facts in finding that a statement that two men had oral sex and were discovered by another individual was inherently improbable). When there are no other facts supportive of the statements being "inherently improbable," courts have found that suggestions of inherent improbability are insufficient. *See, e.g.*, *Watkins v. Washington Post*, No. PWG-17-818, 2018 WL 805394, at *6 (D. Md. Feb. 9, 2018) (mere assertion of inherent improbability was not enough to establish actual malice); *cf. Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 763-64 (4th Cir. 2023) (facts indicated that allegedly defamatory statements were not "inherently improbable").

Inherent improbability does not establish actual malice here. The actionable statements are about (1) the reasons why Dr. McCullough was terminated; and (2) Dr. McCullough being "largely discredited" by the scientific community. Those statements are not "inherently improbable." The article twice stated that Dr. McCullough was terminated for "spreading COVID misinformation[,]" October 6 Article at 1, 3, but it is not "inherently improbable" that a doctor would be terminated for espousing certain views about the COVID-19 pandemic and potential treatment options. Nor is it "inherently improbable" that a doctor who claimed that a vaccine is unsafe would be "largely discredited by the scientific community" for those statements. *Id.* at 1. Plaintiff does nothing more than point to his "stature" to establish actual malice via improbability. Dkt. 1 ¶ 20a. In effect, that argument would mean that defamation plaintiffs of sufficient stature—who, like Dr. McCullough, are often public figures—need not plead any real facts about actual malice, but instead can rely on

the fact that criticisms are "highly improbable."   The First Amendment and *New York Times v. Sullivan* do not tolerate that theory.

Plaintiff also cannot rely on the "peer-review [sic] studies and published research" that he alleges were in Gannett's possession to establish actual malice for the actionable statements at issue.  Dkt. 1 ¶ 20b.  First, that allegation is far too unspecific for Plaintiff to meet his burden. Plaintiff does not allege what studies, research, or other information Gannett had at its disposal which would impute knowledge that Gannett's specific statements were false when it published them.  Plaintiff's vague allegation that Gannett possessed studies and research that proved its statements wrong is a conclusory one.  *Cf. Guido v. Advanced Infusion, Inc.*, No. L-10-423, 2010 WL 11691938, at *2 (D. Md. Sep. 15, 2010) (vague allegation insufficient to show actual knowledge).

Even assuming that allegation is not conclusory, it does not establish actual malice.  Dr. McCullough claims that the studies and research Gannett had in its possession showed that his "statements about COVID and the vaccines were 100% factual and correct."  Dkt. 1 ¶ 20b. However, even taking his allegation as true, that has no bearing on the actual malice inquiry for the two sets of actionable statements here.  Even if Gannett knew that all of Dr. McCullough's statements about COVID and vaccines were true, that is not relevant to malice vis-à-vis Dr. McCullough's termination.  Similarly, the accuracy of Dr. McCullough's statements about COVID and vaccines is of no import to whether Gannett exhibited malice in stating that Dr. McCullough is discredited by the scientific community.  Quite simply, assuming Plaintiff's allegations are true, all he alleges is that Gannett knew his *own* statements about COVID and vaccines were true; that does not mean Gannett knew his colleagues credited those views.

Allegations of bias or prejudice on Gannett's part do not establish actual malice here, either. Plaintiff spends a few sentences trying to establish bias:

> Prior to publication, Gannett, BEE, Malik and Ascension harbored an institutional hostility, hatred, extreme bias, spite and ill-will towards Dr. McCullough. This bias and prejudice motivated Defendants to publish the intentionally false statements about Dr. McCullough. Defendants intended to inflict harm through knowing or reckless falsehoods.

Dkt. 1 ¶ 20c. Those allegations of "hostility, hatred, extreme bias, and ill-will towards Dr. McCullough" are irrelevant to actual malice. The Supreme Court has been quite clear: "[a]ctual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991).[13] Actual malice deals with a defamation defendant's *knowledge* or recklessness about the falsity of its statements, not the motivations undergirding publication. *See Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 659 (1989) (proof that a statement was made with actual malice requires showing "knowledge that it was false or with reckless disregard of whether it was false or not"). Indeed, a defamation defendant can act with spite or ill-will but not actual malice—and vice-versa.[14] Thus, the allegations of spite and ill-will, even when taken as true, have no relevance to the actual malice inquiry.

Finally, Plaintiff's allegation that Gannett "intentionally abandoned all journalistic standards and integrity" does not enhance his position regarding the need to plead actual malice.

---

[13] Plaintiff cites various out-of-circuit decisions to support his assertion that bias and prejudice can lead to an inference of actual malice. Dkt. 12 at 24. But those cases recognize the distinction between bias and actual malice. *See, e.g., Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 313 (5th Cir. 1995) (citing the statement from *New York Times v. Sullivan* that "[a]ctual malice is not ill will").

[14] Even if bias or prejudice were relevant here, Plaintiff has done nothing more than offer conclusory allegations about bias and prejudice and has offered no actual facts to support those allegations.

28

While he cites *Curtis Pub. Co. v. Butts,* 388 U.S. 130 (1967) in support, subsequent case law has made clear that *Butts* did not hold that defendants are held to their professional standards on questions of malice. *See Harte-Hanks*, 491 U.S. at 666 ("Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule . . . ."). At bottom, "journalistic standards" are irrelevant to the inquiry of actual malice; knowledge is what matters. *See Church of Scientology Intern. v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) ("[A]ctual malice cannot be established merely by showing a departure from accepted journalistic or professional practices.").[15]

In sum, Plaintiff has not alleged facts supporting actual malice. In fact, Plaintiff has alleged few to no facts about Gannett's knowledge about the falsity of all of the statements he alleges are defamatory, let alone those the Court has found are actionable. His efforts to wave at his other conclusory allegations are woefully insufficient.

### 3. Defendant's Anti-SLAPP Motion

Gannett also brings a Motion for Attorney's Fees pursuant to Virginia's anti-SLAPP (strategic lawsuit against public participation) statute, Va. Code Ann. 8.01-223.2. Dkt. 11. Under that statute, a defamation defendant is "immune from civil liability" if a claim is brought against it "based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are

---

[15] In any event, the only standard that Plaintiff has sufficiently alleged was violated is the one that commands publications to contact story subjects for comment before publication. Assuming that is a journalistic standard that Gannett follows, it does not indicate actual malice. *See Klayman v. City Pages*, 650 F. App'x 744, 750 (11th Cir. 2016) (failure to contact defamation plaintiff before publication was irrelevant to actual malice inquiry); *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1254 n.10 (9th Cir. 1997) (no requirement for defamation defendant to contact plaintiff before publication).

communicated to a third party." Va. Code Ann. 8.01-223.2A.  The immunity does not apply if the statements were made "with actual or constructive knowledge that they are false or with reckless disregard for whether they are false." *Id.*  If a defamation defendant successfully obtains dismissal pursuant to the immunity, they "may be awarded reasonable attorney fees and costs."  Va. Code Ann. 8.01-223.2B.

An award of attorney's fees under Virginia's Anti-SLAPP statute is permissive.  While the Virginia Supreme Court has not conclusively resolved whether a court is to exercise discretion in awarding attorneys' fees pursuant to the Anti-SLAPP statute, the Fourth Circuit recently held that "an award pursuant to [Virginia's Anti-SLAPP statute] is permissive, not mandatory or presumptive." *Fairfax v. CBS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021).  In doing so, the Fourth Circuit rejected the defamation defendant's argument that a dismissal pursuant to the Anti-SLAPP immunity creates a presumption in favor of fee-shifting and upheld the district court's decision to not award fees. *Id.* at 297.  The Court will so exercise its discretion here.

The purpose of Virginia's anti-SLAPP statute is to deter lawsuits that are designed to chill speech about matters of public concern.  In effect, the anti-SLAPP statute provides another layer of protection for Virginia citizens' First Amendment rights: the statute "weed[s] out and deter[s] lawsuits brought for the improper purpose of harassing individuals who are exercising their protected right to freedom of speech." *Id.* at 296.  The chief concern motivating an anti-SLAPP statute is to protect defamation defendants from litigating "meritless civil action[s]" that are "intended to force upon a political opponent the high cost of defending against a lawsuit." *ABLV Bank v. Ctr. for Advanced Def. Stud. Inc.*, No. 1:14-cv-1118, 2015 WL 12517012, at *2 (E.D. Va. April 21, 2015).

Here, the immunity provided by the anti-SLAPP statute applies to Gannett.  As explained above, since the articles at issue were about the COVID-19 pandemic and the resulting medical responses to it, Plaintiff's defamation claim is "based solely on statements . . . regarding matters of public concern."[16]  Va. Code Ann. 8.01-223.2A.  And, as set forth above, those statements are "protected under the First Amendment to the United States Constitution," because they (1) are not actionable statements; or (2) were not made with actual malice.  *Id.*  Similarly, because there are no allegations that the statements were "made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false," (*i.e.*, the allegations are insufficient to adequately plead that they were made with actual malice), the immunity applies.

Plaintiff's only response is that the anti-SLAPP statute can be "overcome by virtue of a defendant's improper mental state[,]" a question to which he is entitled "discovery and a trial by jury."  Dkt. 20 at 2.  He cites *Alexis v. Kamras*, 3:19-cv-543, 2020 WL 7090120 (E.D. Va. Dec. 3, 2020) in support.  But *Kamras* does not stand for the proposition that a defamation defendant cannot benefit from anti-SLAPP immunity unless a jury affirmatively finds that he did *not* make the statements at issue with actual malice.[17]  Plaintiff's reading of the statute would undermine its very intention, which is to "deter lawsuits brought for the improper purpose of harassing individuals who are exercising their protected right to freedom of speech."  *Fairfax*, 2 F.4th at 296.  It would be nonsensical to read the statute as requiring discovery and a jury trial on a question related to anti-SLAPP immunity when the very purpose of the immunity is to allow defamation defendants faced with meritless civil suits to *avoid* that discovery and trial.  And so this Court, like

---

[16] Plaintiff does not contest that the subject-matter at issue was of public concern anywhere in his briefing.

[17] Importantly, *Kamras* was resolved on summary judgment, not a motion to dismiss, and so the procedural posture distinguishes that case from the one at hand.

other courts, finds that the immunity applies when a complaint fails to *plead* actual malice. *See Fairfax*, 534 F. Supp. 3d at 598-99 (analyzing propriety of attorneys' fees when defamation plaintiff failed to "adequately allege that [defendant] published the challenged publications with actual malice"); *cf. Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*, 821 F. App'x 234, 241-42 (4th Cir. 2020) (reviewing district court's decision not to award attorney's fees after it dismissed defamation suit when plaintiff offered "no plausible allegations of actual malice").

Having determined that the immunity applies, the Court must now evaluate whether it is appropriate in this case to award attorney's fees pursuant to Va. Code Ann. 8.01-223.2B. The statute does not provide any guidance for this Court to follow in the exercise of its discretion. However, other courts in this district have looked at whether the action is "frivolous, unreasonable, or without foundation" and whether "there is substantial basis in fact and in law for the non-prevailing party to pursue the action." *Fairfax*, 534 F. Supp. 3d at 600 (collecting cases). Courts also consider whether the plaintiff "acted out of an improper motive[,]" whether there is an "imbalance in resources[,]" or whether an award of fees would unfairly discourage other plaintiffs from bringing colorable claims. *Id.* at 601-02 (collecting cases).

Here, the relevant considerations weigh against an award of attorney's fees. As set forth *supra*, there was some basis in fact and in law for Plaintiff to bring this action (albeit bases that are legally insufficient under the Rule 12(b)(6) standard). Plaintiff adequately pled facts showing that Gannett could theoretically be held liable for defamation in this case. Moreover, the Court found three of the challenged statements to be actionable and Plaintiff made colorable arguments in support of his claims of actual malice. In sum, Plaintiff's allegations are "not so groundless, frivolous, or unreasonable" so as to justify an award of attorneys' fees. *Id.* at 601. Additionally, there is not an "imbalance of resources" between Plaintiff and Gannett Co. Inc. in this case; if

anything, the imbalance cuts against Gannett Co. Inc.  Finally, there is no indication that this Plaintiff filed this lawsuit to further an "improper motive" such as chilling speech; he brought this lawsuit many months after the underlying articles were published, and Defendant has not offered much that implies an improper motive for this lawsuit.  Having considered all of those factors, the Court concludes that an award of attorneys' fees here is not appropriate.  *See id.* at 600-02 (declining to award attorneys' fees under anti-SLAPP statute).

## IV. CONCLUSION

During a time of intense national upheaval due to a worldwide pandemic, Dr. McCullough exercised his First Amendment right to speak out on issues related to COVID-19.  His right to do so was firmly protected by the First Amendment, and he accordingly spoke without reprisal.  Now, with the tables turned, he has sought to impose civil liability on the media that reported on what he said and offered competing viewpoints.  The First Amendment does not condone such a lawsuit.  Rather, it protects the speech that criticized Dr. McCullough—just as it protected his own speech.

It is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 12) is GRANTED; and it is

FURTHER ORDERED that Defendant's Motion for Attorney's Fees (Dkt. 10) is DENIED.

The Clerk is directed to close this civil action.

IT IS SO ORDERED.

Alexandria, Virginia
April 25, 2023

/s/

Rossie D. Alston, Jr.
United States District Judge

33